The Honorable Henry Wilkins, III State Representative 303 North Maple Street Pine Bluff, AR 71601
Dear Representative Wilkins:
This is in response to your request for an opinion regarding a recent United States Supreme Court ruling involving minority set-asides. You state that it is your understanding that such set-asides were ruled unconstitutional. Your specific request is as follows:
 If such a ruling has been made by the United States Supreme Court, please provide me with a legal opinion regarding the implications and/or effects of the ruling as it relates to state set-asides, the 1982 Surface Transportation Act, Public Law 95-507, and any other federal state or local laws as they pertain to set-asides.
The U.S. Supreme Court did recently render a decision in the case of City of Richmond v. J.A. Croson Company, ___ S.Ct. ___ (decided January 23, 1989), involving a minority set-aside for subcontracts on city construction contracts. The Supreme court in this case affirmed the Fourth Circuit Court of Appeals' ruling (J.A. Croson Co. v. Richmond, 822 F.2d 1355 (4th Cir. 1987) that the minority set-aside plan in question violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.
The Court, in a lengthy opinion, reviews the various bases for its conclusion that there was no compelling governmental interest justifying the race-based measure. The Court applies a strict scrutiny standard of review in assessing the constitutionality of a city ordinance which adopted a "Minority Business Utilization Plan" ("the Plan"). The Plan required prime contractors awarded city construction contracts to subcontract at least 30% of the dollar amount of the contract to one or more Minority Business Enterprises, which were defined as businesses anywhere in the country at least 51% of which are owned by "minority group members." Minority group members were defined as Blacks, Spanish-speaking, Oriental, Indian, Eskimo, or Aleut citizens.
In considering the constitutionality of the Plan, the Court first rejects appellant's argument that the city ". . . enjoys sweeping legislative power to define and attack the effects of prior discrimination in its local construction industry." City of Richmond, p. 11. The Court also rejects the other "stark alternative" presented by the appellee: that the city ". . . must limit any race-based remedial efforts to eradicate the effects of its own prior discrimination." Id.
The Court concludes, instead, that "[i]n the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion." Id., p. 23. The Supreme Court rejects the Court of Appeals' conclusion that there must be some showing of discrimination by the city. Rather, the Court notes:
 [I]f the city could show that it had essentially become a `passive participant' in the system of racial exclusion practiced by elements of the local construction industry, we think it clear that the city could take affirmative steps to dismantle such a system.
Id., p. 14.
The Court does state, however, that a "race-based measure" such as the Plan in question is a "highly suspect tool," that must be "strictly reserved for remedial settings." Id., p. 15. In this regard, the Court notes that a "generalized assertion that there has been past discrimination in an entire industry" provides an insufficient basis for use of "race-conscious classifications". Id., p. 17. The Court cites to the following language from its prior decision in Fullilove v. Klutznick, 448 U.S. 448, 533-535
(1980):
 `Because racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate.'
City of Richmond, p. 21
After reviewing the evidentiary basis for the Plan in this case, the Court concludes that ". . . none of the evidence presented by the city points to any identified discrimination in the Richmond Construction industry." Id. The Court rejects the District Court's reliance upon the fact that the city council designated the plan as "remedial," stating that ". . . the mere recitation of a `benign' or legitimate purpose for a racial classification is entitled to little or no weight." Id., p. 18-19. The Court similarly rejects generalized statements regarding the existence of discrimination in the construction industry. Id., p. 19. Reliance upon the disparity between the number of prime contracts awarded to minority firms and the minority population of the city was also deemed misplaced. Id. The Court notes the following in this regard:
 There is no doubt that `[W]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination' under Title VII. Hazelwood School Dist. v. United States, 433 U.S. 299, 307-308
(1977). But it is equally clear that `[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.' Id., at 308, n. 13. [Citation omitted.] In the employment context, we have recognized that for certain entry level positions or positions requiring minimal training, statistical comparisons of the racial composition of an employer's workforce to the racial composition of the relevant population may be probative of a pattern of discrimination. [Citation omitted.] But where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task. [Citation omitted.]
Id.
The city's evidence in this regard failed. There was no showing regarding the number of qualified Minority Business Enterprises in the relevant market; nor did the city show the percentage of total city construction dollars now received by minority firms as subcontractors on the city's prime contracts. The low membership of Minority Business Enterprises in local contractors' associations was also deemed irrelevant where there was no link between the number of businesses eligible for this membership. Id., p. 20.
The "random inclusion" in the Plan of other racial groups was also negatively received by the Court. Id., p. 22. And the absence of attempted race-neutral alternative remedies caused the Court to conclude that ". . . it is almost impossible to assess whether the Richmond Plan is narrowly tailored to remedy prior discrimination." Id. The Court states: "[m]any of the barriers to minority participation in the construction industry relied upon by the city to justify a racial classification appear to be race neutral. If [Minority Business Enterprises] disproportionately lack capital or cannot meet bonding requirements, a race-neutral program of city financing for small firms would, a fortiori, lead to greater minority participation." Id. The Court also finds that the 30% quota is not "narrowly tailored to any goal, except perhaps out-right racial balancing. It rests upon the `completely unrealistic' assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." (Citation omitted). Id., p. 23. Although the Plan did reflect a waiver procedure, whereby the Plan's requirements could be waived if qualified Minority Business Enterprises were unavailable, the Court notes that this system ". . . focuses solely on the availability of MBEs; there is no inquiry into whether or not the particular MBE seeking a racial preference has suffered from the effects of past discrimination by the city or prime contractors." Id.
It thus appears that the factual predicate supporting the Plan was not sufficient for the Court to conclude that race-based relief was authorized. The foregoing discussion offers some guidance in this regard. It is apparent that there must be a "strong basis in evidence" for concluding that remedial action in the form of a minority set-aside is necessary. Id., p. 18. The following statement indicates that the Court has not ruled that minority set-asides are per se unconstitutional:
 Nothing we say today precludes a state or local entity from taking action to rectify the effects of identified discrimination within its jurisdiction. If the city of Richmond had evidence before it that nonminority contractors were systematically excluding minority businesses from subcontracting opportunities it could take action to end the discriminatory exclusion. Where there is significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, and inference of discriminatory exclusion could arise. [Citation omitted.] Under such circumstances, the city could act to dismantle the closed business system by taking appropriate measures against those who discriminate on the basis of race or other illegitimate criteria. [Citation omitted.] In the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion.
Id., p. 23.
It may be concluded that the Court will review the facts in each particular case to determine whether a minority set-aside plan is justified and in conformity with the Equal Protection Clause. This case indicates that the strict scrutiny standard of review will apply, although the Court does suggest, in dicta, that the level of scrutiny may vary ". . . according to the ability of different groups to defend their interests in the representative process." Id., p. 16.[1] The plan must be narrowly tailored to remedy prior discrimination.
There is also a suggestion that a race-based policy directed toward a public employer's own work force may require a showing of prior discrimination by the governmental unit involved. Id., p. 14. And the consideration, or lack thereof in this instance, of race-neutral alternative remedies may also be a relevant factor in assessing proposed state or local set-aside plans.
In response to your specific question involving the 1982 Surface Transportation Act (P.L. 97-424) and Public Law 95-507, I assume that the portion of the Transportation Act in question involves the provision for grants for airport development and planning wherein 10% of federal grant funds is to be expended "with small business concerns owned and controlled by socially and economically disadvantaged individuals." 49 App. U.S.C.A. 2204(a). The term "socially and economically disadvantaged individuals" has the meaning ascribed under Section 637(d) of Title 15 (P.L. 95-507), which states: "[t]he contractor shall presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans and other minorities, or any other individual found to be disadvantaged by the Administration pursuant to section 8(a) of the Small Business Act [15 U.S.C.A. 637(a)].[2]
The Court's discussion in City of Richmond, supra, of its prior decision in Fullilove v. Klutznick, supra, should be noted in this regard. See, City of Richmond, p. 11-14. Fullilove involved a set-aside provision of the Public Works Employment Act of 1977 requiring the expenditure of at least 10% of public works projects federal grants for "minority business enterprises." These enterprises were defined as businesses effectively controlled by "'citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts.'" City of Richmond, p. 11, citing Fullilove, 448 U.S. at 454.
In citing to Fullilove, the Court in City of Richmond notes that its acceptance of the minority set-aside plan in that case was premised largely upon Congress' "unique remedial powers" under Section 5 of the Fourteenth Amendment to the United States Constitution. City of Richmond, p. 12. The court also notes the "flexible nature" of that 10% set-aside which included a waiver alternative where no minority businesses were available or where a minority business charged an unreasonable price, thus indicating that the remedial aspects of the program were being exploited. Id.
With regard to Congress' remedial powers, the Court notes with Chief Justice's finding in Fullilove, that "Congress' commercial power [is] sufficiently broad to allow it to reach the practices of prime contractors on federally funded local construction projects." City of Richmond, p. 12, citing Fullilove,448 U.S. at 473. In Fullilove, Congress had evidence that a nationwide history of past discrimination had reduced minority participation in federal construction grants. The City of Richmond court cites to the Chief Justice's conclusion in Fullilove that "'Congress had abundant historical basis from which it could conclude that traditional procurement practices, when applied to minority businesses, could perpetuate the effects of prior discrimination.'" City of Richmond, p. 12., citing Fullilove, 448 at 478.
The appellant in City of Richmond, in reliance upon Fullilove, argued that a city council, like congress, need not make specific findings of discrimination in order to engage in race-conscious relief. The City of Richmond Court rejects this argument, however, stating:
 What appellant ignores is that Congress, unlike any State or political subdivision, has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment. The power to `enforce' may at times also include the power to define situations which Congress determines threaten principles of equality and to adopt prophylactic rules to deal with those situations. [Citation omitted.]
Id., p. 13 (emphasis in original.)
The Court in City of Richmond also notes that neither "strict scrutiny" nor ". . . any other traditional standard of equal protection review" was employed in Fullilove. Id. The City of Richmond opinion notes the Chief Justice's statement in Fullilove that:
 [A]lthough racial classifications call for close examination, the [Fullilove] Court was at the same time, `bound to approach [its] task with appropriate deference to the Congress, a co-equal branch charged by the Constitution with the power to provide for the . . . general, welfare of the United States' and `to enforce by appropriate legislation,' the equal protection guarantees of the Fourteenth Amendment.
City of Richmond, p. 11-12, citing Fullilove, 448 U.S. at 472.
This deference to Congress, flowing from its commerce power and its remedial powers and duties under the Fourteenth Amendment, will in all likelihood also arise in the context of other federal set-aside provisions, including the ones referenced in your correspondence. While the outcome of any challenge to these provisions is currently unknown, in the absence of a specific judicial determination, the aforementioned discussion of Fullilove in the City of Richmond case offers some indication of the Supreme Court's approach to similar federal legislation.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Elisabeth A. Walker.
[1] The Court notes that "heightened scrutiny" would, nevertheless, apply in this case since blacks comprise approximately 50% of the city's population and hold five of nine seats on the City Council.
[2] Women are presumed to be socially and economically disadvantaged for purposes of the aforementioned provision of the 1982 Surface Transportation Act. See, 49 App. U.S.C.A. 2204(d)(B).