Genny BUSKUS, Plaintiff,

v.

## SOUTHWESTERN BELL YELLOW PAGES, INC., Defendant.

### No. LR–C–89–246.

United States District Court,
E.D. Arkansas, W.D.

Sept. 13, 1990.

---

Morgan E. Welch, North Little Rock, Ark., for plaintiff.

Philip E. Kaplan, Little Rock, Ark., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HENRY WOODS, District Judge.

### FINDINGS OF FACT

1. Plaintiff Genny Buskus is a white female who was employed as a directory representative for Southwestern Bell Yellow Pages, Inc. from January 20, 1988 until January 27, 1989.

2. As a probationary employee, the plaintiff was required to meet either the sales objectives for each book set by Southwestern Bell Yellow Pages or, at least, the

average sales results of all the directory representatives who worked the same canvasses as the plaintiff (referred to as "premise average"). It was undisputed that all employees were evaluated only on O Pool results and that the plaintiff was aware of the fact that O Pool results were used for evaluation purposes.

3. The plaintiff received classroom training in Oklahoma conducted by defendant and was given supervised initial field training in Arkansas until March 4, 1988.

4. Plaintiff was classified as a probationer during her first year of employment. There is a dispute as to whether the year began at the date of hire or at the termination of her training period. The probation expiration date is not essential to a determination of the issues in this case since the company did not guarantee that new hire would be employed for the entire period of probation.

5. After probation is successfully completed, employees continue to be evaluated on O Pool results and remain subject, at management discretion, to discipline, including termination, for failing to meet the objective or premise average.

6. After she completed her training, plaintiff was assigned to work the Hope, Nashville and Newport canvasses. Her supervisors during these canvasses were her two trainers. Newberry worked approximately one week with plaintiff, and Zamora worked another week with her. After completing these two canvasses, plaintiff was assigned to a sales group supervised by Jim Bransford.

7. In order to monitor the performance of his representatives, Bransford regularly met with each of his representatives, including plaintiff, to examine major accounts, and to review and to approve proposed ads. Additionally, he rode or made calls with his representatives to assess the manner in which sales were being conducted, and he regularly called on customers to ascertain the customers' perceptions of how the representatives conducted themselves. Bransford maintained reports of his evaluations on each of his representatives in the Sales Action Development binder. Included within this binder were the following reports: New Representative Progress Reports (for new representatives only), Observation Contact Evaluations, Recontact reports, and notes of development meetings. These binders were at all times available for the employees' inspection. The representatives were requested to review and sign the various reports as they were prepared.

8. The New Representative Progress Report is the supervisor's assessment of the new hire's skills and performances; the Observation Contact Evaluation form identifies his/her strengths and weaknesses; the Recontact form reflects the impression made on a customer.

9. The reports and evaluations in plaintiff's Sales Action Development binder (Defendant's Exhibit 2) reflect that the plaintiff had problems in her sales techniques and results, which surfaced very early in her career with Southwestern Bell Yellow Pages. Plaintiff was advised at various times that her performance was below premise average and she would not be retained by the company unless her performance improved. All of these reports and evaluations were reviewed with the plaintiff, and the vast majority of these documents were signed by the plaintiff.

10. Bransford testified and I find that because of plaintiff's poor performance, he assisted plaintiff more than his other employees and monitored her work more closely in an effort to assist her in improving her performance and to assist management in determining whether plaintiff possessed the requisite skills.

11. In the first year of her employment, the plaintiff had completed the following canvasses: Hope '88, Nashville '88, Newport '88, Hot Springs '88, Arkadelphia '88, Little Rock '89, Walnut Ridge '89 and Jonesboro '89. She was still working on the following canvasses: Ashdown '89 and Nashville '89.

12. Plaintiff was terminated on January 27, 1989. Bransford did not recommend to Dick Brown, the company manager, that plaintiff be given additional time to im-

prove through an extension of her probation. From his observations of her performance, Plaintiff had not demonstrated that her sales skills were improving. Her results in Ashdown and Nashville, which were uncompleted canvasses, reflected that she was performing below the premise average and that there were no signs of improvement.

13. Plaintiff filed a timely charge of sex discrimination with the EEOC and was issued a Right to Sue letter on March 28, 1989.

14. Plaintiff generally alleged in her complaint that the defendant discriminated against her because of her sex not only during the course of her employment, but also in its decision to terminate her. In support of her allegations, she attempted to prove that the company maintained a hostile environment against females; that during her year of employment with the company she was treated differently from her male counterparts by her supervisor; and that she was terminated prior to the end of her probationary period for performing below premise average while men, who likewise were below premise average, had their probations extended in order to give them additional time to enhance their performance.

15. I find the plaintiff has failed to establish that the defendant maintained a hostile work environment. Of the eight incidents on which plaintiff relies, only two occurred while she was working there.

16. The only alleged incident of any significance was related by Dwight Harshaw, a crew member with plaintiff during the Hot Springs canvass. He testified that, while discussing the new employees who would be joining the crew, Bransford said to Dave Specht, another directory representative, "Well, Specht, I guess you have yourself another road whore." Harshaw testified that Specht, Steve Roemer and Jim Hicks were present. All three, in addition to Bransford, denied that such a statement was made. In view of the weight of the contradictory testimony, I find that plaintiff has failed to shoulder her burden of proof that such a statement was actually made.

17. The other statement made during plaintiff's employment was made in plaintiff's presence. It was a complete triviality. It did not relate to plaintiff or to female employees of defendant. Bransford asked a representative involved in a divorce suit whether his wife ate bonbons and watched soap operas all day.

18. An examination of the other six incidents, which occurred when the plaintiff was not an employee, discloses that two involved remarks made by Virgil Hudson, a former supervisor. These alleged remarks were generalities which denigrated women's ability to perform the directory job. Hudson had retired before plaintiff came to work for defendant. Three other incidents occurred in after-hours social settings. The remaining remarks about a woman's large breasts was allegedly made by Bransford, but the witness could not fix it at a time when Bransford was a supervisor or was one of the directory representatives.

19. One incident perhaps deserves further comment, although it occurred at Fort Smith after plaintiff had been terminated. Plaintiff had never worked at Fort Smith. Diana Reagan testified that her sales manager, after they had spent the evening together having dinner and drinks, suggested that she have breast reduction surgery. She reported the comments to Dick Brown, the company manager. The sales manager apologized, and she was transferred to Little Rock. Ms. Reagan testified that after her transfer she worked on Mr. Bransford's crew and was not treated differently from the men on her crew and that Bransford never discriminated against her.

20. I find that the plaintiff has not carried the burden of proving the allegation that Bransford did not assist her to the extent that he assisted new member coworkers.

21. Plaintiff complains about two instances in which she failed to receive proper credit for sales. When she complained about the Texarkana matter, an adjustment was made in her favor. The Jonesboro controversy involved an application of the

company's ground rules. Under the union contract she had a right to file a grievance. Not having availed herself of this right, her complaint now comes too late. Furthermore, I find it to be tenuous at best.

22. There was no discrimination in the failure to assign plaintiff to rework accounts. Reworking assignments is based on past performance, and the company was justified in failing to select plaintiff for rework.

23. The plaintiff claims that she was treated differently from males in that some males were given extensions of their probationary period—a privilege not extended to her. She cited four instances of males who, like her, were below premise average but were given extra time to enhance their performances. Three of the men were eventually terminated, and one resigned when it became evident that he would not meet the premise average. Only one of these men worked for the company during plaintiff's employment. The company has offered satisfactory reasons for the extension of probation in these four cases. Three were operating under a former collective bargaining agreement under which employees were evaluated on all results, not simply "O" Pool results. This sometimes caused inordinate bad debt accounts to be attributed to the directory representative. The extensions were given to these employees to compensate for the possibility of an unfair effect from random assignments. At that time they were undergoing a shift to the new system of consideration for only the "O" Pool, as mandated by the new collective bargaining agreement.

24. Ray Maginn was hired on March 24, 1988, and terminated May 12, 1989. His employment dates coincided roughly with those of plaintiff. Maginn had performed below premise average on the Little Rock canvass but showed good results on the road books. His period of probation would have ended in March 1988 during the time he was working the Hot Spring canvass. At the end of March, it appeared that he would have good results for Hot Springs. However, the canvass was not scheduled to close until May. The company had also decided to start the Little Rock canvass early, and pull out of Hot Springs early. At that point, management had to decide whether to terminate Maginn without benefit of the Hot Springs results, or to give Maginn a partial Little Rock assignment and wait until the Hot Springs book closed in May to make their final decision with Maginn. Brown, at the recommendation of Maginn's supervisor, decided to extend Maginn's probation until the Hot Springs canvass closed. When the Hot Springs book closed, Maginn's results were below premise average and he was terminated.

25. In contrast with these four representatives, plaintiff did not present evidence of extenuating circumstances at the end of her probation that warranted its extension. Plaintiff was working under the plan that afforded her protection from bad debts. Yet she met or exceeded premise average on only two of eight books. On one of the two books in which she met premise average, she still lost revenue for the company but lost less than the average. On the canvasses not completed at the time of her termination, plaintiff was performing at below premise average. Her supervisor had not recommended extension because, based on his observations, plaintiff had not demonstrated the requisite skills to continue as a directory representative.

26. On the entire record, I find that plaintiff has failed to sustain her burden of proving intentional discrimination.

CONCLUSIONS OF LAW

1. This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1343(a)(3) and (4) to secure relief authorized by 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1964, as amended.

2. The plaintiff filed timely charges of discrimination with the EEOC.

3. The defendant is an employer within the meaning of 42 U.S.C. § 2000e *et seq.*

4. This is a disparate treatment case in which plaintiff claims that she has been treated less favorably because of her sex. Plaintiff must prove discriminatory animus. *Texas Dept. of Community Af-*

*fairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

■ 5. Disparate treatment cases require that plaintiff demonstrate an intent to discriminate. However, a plaintiff may also establish a *prima facie* disparate treatment case without actual proof of intent. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335, note 15, 97 S.Ct. 1843, 1854 note 15, 52 L.Ed.2d 396 (1977). In these cases, a plaintiff may demonstrate intent by showing that the defendant has engaged in a "pattern and practice" of discrimination. If the plaintiff alleges a pattern and practice of discrimination, the plaintiff must demonstrate that the defendant has intentionally engaged in systematic disparate treatment of a specific sex. *Hazelwood School Dist. v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

■ 6. In order for a plaintiff to prevail in a Title VII action, the court must first find that plaintiff has proved a *prima facie* case by a preponderance of evidence. *Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. at 254 note 7, 101 S.Ct. at 1094 note 7; *Chaffin v. Rheem Mfg. Co.,* 904 F.2d 1269, 1273 (8th Cir. 1990). A determination as to whether plaintiff has proved a *prima facie* case of discrimination is made only after considering the evidence adduced by both parties. *EEOC v. E.I. Du Pont de Nemours,* 445 F.Supp. 223 (D.Del.1978).

7. Different specific *prima facie* case inquiries have been developed to meet different aspects of disparate treatment claims, but they all require the individual plaintiff to prove that he or she is a member of a protected class and has been treated less favorably than others in like circumstances. Further, the plaintiff must show facts which give rise to an inference of intentional discrimination. *Craik v. Minn. State Univ. Board,* 731 F.2d 465 (8th Cir.1984).

■ 8. With respect to a termination claim, a plaintiff must establish the following in order to establish a *prima facie* case of discrimination: (1) she is a member of a

protected class; (2) she was capable of performing her job satisfactorily; and (3) she was discharged. *Johnson v. Yellow Freight Systems, Inc.,* 734 F.2d 1304 (8th Cir.1984).

■ 9. If the court concludes that plaintiff has proved a *prima facie* case by a preponderance of evidence, then the court must consider the explanation or justification for the presumptively discriminatory action or practice. This explanation must be advanced by the defendant. The defendant must introduce admissible evidence showing a legitimate nondiscriminatory reason for its action, but it need not prove that it was actually motivated by the proffered reason. *Texas Dept. of Community Affairs v. Burdine, supra* 450 U.S. at 254, 255, 101 S.Ct. at 1094, 1094; *Chaffin, supra* at 1272.

■ 10. Upon the articulation by the employer of such a reason, the burden shifts back to the plaintiff to prove by a preponderance of evidence that the reasons articulated by the employer are in fact a pretext for unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine, supra* 450 U.S. at 256, 101 S.Ct. at 1095; *Chaffin, supra* at 1272; *Johnson v. Yellow Freight Systems, Inc., supra* at 1307.

■ 11. In the instant case, the plaintiff has failed to prove by a preponderance of evidence a *prima facie* case of discrimination as it relates to her termination claim. Specifically, plaintiff failed to demonstrate that she was performing her job in a satisfactory manner.

■ 12. Assuming that plaintiff made a *prima facie* case, defendant articulated a legitimate nondiscriminatory reason for discharging plaintiff—failure to meet the group average.

13. The burden then shifted to plaintiff to establish that the reason given for her termination was pretextual. Plaintiff has failed to sustain her burden in this respect.