Carolyn MAZUS

v.

**DEPARTMENT OF TRANSPORTATION, COMMONWEALTH OF PENNSYLVANIA, Leonard D. Coddington, Richard Thornburgh, Governor of Pennsylvania, Thomas Larson, Secretary of Transportation, and Governor's Personnel Secretary (Name unknown).**

Civ. No. 76–683.

United States District Court, M. D. Pennsylvania.

June 29, 1979.

Peter B. Broida, Washington, D. C., Winkler, Danoff & Lubin, Wilkes Barre, Pa., for plaintiff.

Frank Fisher, Jr., Reynold J. Kosek, Timothy W. Pawol, Commonwealth of Pa., Dept. of Transp., Harrisburg, Pa., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

 Plaintiff, Carolyn Mazus, alleging discrimination in employment on the basis of her sex, seeks compensatory and punitive damages, as well as injunctive relief [1] from the Commonwealth of Pennsylvania and Leonard D. Coddington, Superintendent of the Milford Office of the Pennsylvania Department of Transportation, and other Commonwealth officials, including the Governor, his Personnel Director, and the Secretary of Transportation.[2] A nonjury trial was held November 7, 8, 1977, and May 11, 1978, and after submission of Requests for Findings of Fact and appropriate briefs, the matter is now ripe for disposition.[3]

## FINDINGS OF FACT

1. Carolyn Mazus is a female resident of Lords Valley, Hawley, Pennsylvania, a community located in Pike County.

2. The Pennsylvania Department of Transportation ("PennDOT") is the department of the Commonwealth of Pennsylva-

---

1. Jurisdiction was invoked pursuant to 42 U.S.C. § 1983; 28 U.S.C. § 1343(3)(4); 28 U.S.C. § 1331(a); 42 U.S.C. § 2000e–5(f); the Fourteenth Amendment of the United States Constitution; and 28 U.S.C. § 2201.

2. Earnest Gastmeyer, the Democratic County Chairman for Pike County, was joined as a defendant but, after plaintiff rested, a motion for directed verdict was granted as to him.

3. Plaintiff has renewed her motion for class certification. The reasons given for denying the motion initially continue to apply: there has been no showing that the class includes anyone but plaintiff and the numerosity requirement has not been satisfied. Additionally, plaintiff has not demonstrated common questions of law or fact, or that the defendants have acted or refused to act on grounds generally applicable to the class. There has been no evidence that any other person has allegedly been subjected to similar treatment except for Census Bureau statistics which are unpersuasive.

nia responsible for construction and maintenance of state highways.

3. The Governor of Pennsylvania, Personnel Secretary to the Governor, and Secretary of PennDOT, are the State Officials alternately responsible for setting and implementing employment policies within PennDOT.

4. Leonard Coddington is the Superintendent of Maintenance for PennDOT operations in Pike County.

5. Ernest Gastmeyer was the Democratic County Chairman in Pike County.

6. In 1974 and prior thereto, the hiring of non-Civil Service employees, including highway maintenance workers for PennDOT county organizations, was considered political patronage and was not controlled by PennDOT. The first step, after learning of a vacancy from the County Superintendent, was for the PennDOT Personnel Office in Harrisburg to advise the Governor's personnel representative of the vacancy. The Governor's personnel representative would then notify the County Chairman of the Governor's political party and forward a job application to him. The application would be delivered by the Chairman and/or his political associates to the chosen applicant or transmitted to the Milford Office for delivery and execution by the applicant, and only one application was given out for each vacancy. The patronage process was well known in Pike County and most applicants resorted to political connections in seeking employment. The County Superintendent would forward the executed application and other necessary paperwork to the PennDOT personnel bureau in Harrisburg, which had the authority to cancel the appointment made by the County Superintendent if the employee was deemed unsuitable for the job. The County Chairman would attempt to apportion job openings in the eleven townships and two boroughs in Pike County where the work would actually be performed and where it would be to political advantage.

7. Mr. Coddington, as Superintendent for Pike County, did not have any control over blank job application forms, which in Pike County were under the complete control of the County Chairman and his political subordinates. Further, he had no authority to put anyone on the payroll without a completed job application form. The County Chairman's approval was necessary before he could hire anyone for a field position within PennDOT. There were no blank job application forms available at PennDOT's District Office in Dunmore.

8. Information concerning vacancies for highway maintenance workers is also disseminated through the community by word of mouth by existing employees of PennDOT. The positions were not advertised.

9. From 1971 until the present, PennDOT had been operating under severe budgetary limitations. Therefore, when a person left his employment with PennDOT, that position was abolished and there existed no vacancy. A position could only be filled after the vacancy had been authorized and approved by the Governor's office. This brought PennDOT's employment from 22,000 in 1971 to 17,000 in November of 1977. Because of this freeze, very few people were hired as Highway Maintenance Workers in Pike County since 1971, although many were interested in these positions.

10. In July 1974, Jacob Kassab, Secretary of PennDOT, talked to Mr. Gastmeyer and told him that some highway maintenance workers could be hired "in the fall of that year." Because there were very few openings since 1971, and there was a surplus of applicants, Mr. Gastmeyer had decided either who would receive them, or what political leader could submit an applicant, or in what area in the County the employee would be placed.

11. In October 1974, plaintiff's husband, Daniel, a PennDOT highway employee, received with his paycheck a flyer styled "Benefit of the Month," which promoted affirmative action by encouraging employees to suggest to minority and female acquaintances the idea of applying for PennDOT employment at the Department's county and district offices.

12. Plaintiff, then unemployed, read the "Benefit" and requested her husband to obtain an application form for her to use in obtaining a highway maintenance position with PennDOT. Mr. Mazus asked County Superintendent Coddington for an application for his wife in early November 1974. Coddington believed she was looking for a clerical position and said that there were no

vacancies but that he would try to get her an application. Subsequently, Coddington told him that he could not get an application form for Mrs. Mazus because he had contacted Gastmeyer but had been told that she would have to come to him personally.

13. On November 19, 1974, Mrs. Mazus went to the PennDOT district office at Dunmore, Pennsylvania and requested an application form for highway work. Her request was routed to the District Labor Relations Officer, Bert Davis, who attempted to dissuade her from seeking that type of employment. Both Mr. Davis and Mr. Reginald Knight, an Equal Opportunity Development Specialist with PennDOT at the Dunmore Office, informed Mrs. Mazus that there were not any job applications for non-Civil Service jobs at the District office and that she would have to obtain this application from the County Chairman. Individuals seeking non-Civil Service employment with PennDOT rarely seek job applications at the District Office.

14. On November 20, plaintiff telephoned Gastmeyer, who stated that at that time there were no openings for road workers in Pike County. Gastmeyer had previously been informed of approximately 8 job openings by Secretary Kassab but all had been committed to the various townships by October 1974. He had told Coddington this when Coddington called for an application for plaintiff. Mrs. Mazus asked that she be permitted to place an application on file should openings develop. Gastmeyer told her to be at his home at 5:00 P.M. that day. Mr. and Mrs. Mazus drove to Matamoras, where Gastmeyer lived, telephoning him en route for directions. Plaintiff arrived at Gastmeyer's home at the appointed time, but no one was home.

15. Following her unsuccessful trip to Matamoras, plaintiff and her husband immediately drove to the PennDOT Pike County office at Milford, where she spoke to Mr. Coddington by telephone, describing the trip to Gastmeyer's home and apprised him that she was interested in a highway maintenance and not a clerical position. At that time Coddington told Mrs. Mazus that he anticipated approximately six openings for highway maintenance workers in Pike County. Gastmeyer had previously informed him that these openings had been committed to others. He also knew that there were more applicants than there were jobs and that Gastmeyer had to decide who would get them.

16. On Thursday, November 21, plaintiff returned to PennDOT's district office at Dunmore, where she again met with Knight and Davis in a conference room. Knight, after listening to her difficulties in obtaining the application, suggested that she try to find work with a private contractor. Knight added that he would not want his wife to do that type of work. Davis spoke of women who had been road workers for PennDOT, found the job too difficult, and quit. He also mentioned a woman who had attended an engineering class with him who expected her surveying equipment to be carried for her by male students. At the conclusion of the meeting Davis advised that she should obtain the application from Mr. Gastmeyer, although he also called Mr. Coddington and told him that he could not refuse her an application form.

17. Mr. Coddington, in an effort to obtain a job application form for Mrs. Mazus, went to the County Chairman, Mr. Gastmeyer, on at least three different occasions. However, as previously noted, Mr. Gastmeyer instructed Mr. Coddington that if Mrs. Mazus wished to have an application for a Highway Maintenance Worker's position, she should come to pick it up personally from him. He also told Coddington that all available positions had been spoken for.

18. Toward the end of November 1974, Coddington met with a shop committee to discuss pending grievances filed by the local union. The meeting was attended by three local officers: Daniel Mazus, Calvin Rose, and Herbert Lehman, each of whom testified that at the conclusion of the meeting Mr. Mazus asked Coddington about the application form for his wife. Coddington told Mr. Mazus that he should try to interest her in a clerical job, that he would thereby show "what kind of man he was." Coddington also stated to the group that he would not want to see his own wife in a job requiring her to work in the field with men and without proper sanitary facilities.

19. Again near the end of November, plaintiff called a field office of the Equal Employment Opportunity Commission (EEOC) about her problems with PennDOT. EEOC referred her to the Pennsylvania Hu-

man Relations Commission, the state fair employment practices agency. The agency director, Mr. McCoy, spoke with Mrs. Mazus by telephone and promised her that he would request the district engineer, Mr. Harrington, to send her an application form.

20. On November 25, 1974, John Chichilla, PennDOT Administrative Officer in the Dunmore District Office, received a call from Miriam Marsh of the PennDOT office in Harrisburg who apprised him of plaintiff's efforts to obtain an application. Mr. Chichilla called Mr. Gene Zenyuh[4] and asked him to forward an application to plaintiff. He also called Coddington and asked him to attempt to obtain an application for her. It wasn't until April 1, 1975, when he learned that plaintiff never received an application.

21. When the application form did not arrive, plaintiff filed a charge of discrimination and supporting affidavit with the EEOC on November 29, 1974, alleging that the Commonwealth, PennDOT, and Coddington had discriminated against her by refusing to employ her on the basis of her sex. Following the filing of that charge, plaintiff continued to call Coddington during 1974 and 1975 to inquire about job opportunities. She also wrote to state and federal officials for assistance in obtaining PennDOT employment or at least an application form. She never attempted to contact Gastmeyer again.

22. PennDOT concedes plaintiff's qualifications for a highway maintenance position which required, inter alia, (a) the ability to use simple tools in repairing potholes and minor defects in and around the state roads and (b) sufficient physical strength and freedom from disabling defects to lift heavy objects and to work under adverse weather conditions.

23. There is no evidence showing what plaintiff's political views or affiliations were or that they, in any way, adversely affected how she was treated by anyone from whom she attempted to get a job application. Her husband had been hired during the same Democratic administration and had been recommended by the Democratic County Chairman.

24. PennDOT hired nine men for highway maintenance positions in Pike County during November and December 1974: Frank Johanson (11–20–74); Robert Orven (11–23–74); Gary Hoeper (11–25–74); Moses Sebring (11–26–74); James Gifford (11–26–74); George Hotalen (11–26–74); Bruce Selneck (12–23–74); Adam Sneddon (12–26–74); and Ruben Shiffler (12–30–74).

25. Frank Johanson began looking for employment with PennDOT at least four months prior to his obtaining such on November 20, 1974. Johanson first went to a PennDOT employee, Tom McHugh, who couldn't help him, and he then went to a County Commissioner, Jim Duffy, who ultimately gave him the phone number of the County Chairman, Mr. Gastmeyer. After contacting Gastmeyer, he was told that another PennDOT employee, Sonny Klaus, would bring an application to him. Mr. Klaus was also a Democratic Committeeman in Lackawanna Township. Johanson received his application form the same day he started working, November 20, 1978.

26. Robert Orven, hired on November 23, had first expressed interest in PennDOT employment in 1972, when he asked his friend, Carl Wagner, Pike County District Attorney, for help in getting a job. Three months before he was employed by PennDOT in November, 1974, Orven again visited Wagner, who obtained an application form for him, which Orven completed and returned to Wagner about three weeks before he started on the job. Orven testified that he asked Wagner for assistance because of his political connections.

27. Gary Hoeper filled out an application at the Milford office on April 19, 1973, five or six months after his father, a PennDOT employee, asked if he would like a highway job. His father arranged for him to get the application but he doesn't know how his father did it.

28. Moses Sebring contacted Mr. Coddington about a job in July 1974, thinking that as PennDOT superintendent, Codding-

---

4. It would appear that Mr. Zenyuh was employed in the Governor's personnel department or had some influential connection therein.

ton would be in the best position to help him. A few days before he started work on November 26, Coddington called and asked him to come to the Milford office to fill out an application form. Coddington obtained the form from Gastmeyer in late October or early November as a Democratic Committeeman from Green Township. Sebring lived in Green Township.

29. James Gifford spoke to a PennDOT foreman in late September 1974, who told him that there was a need for men and advised him to inquire at the Milford Office. There Gifford spoke with Committeeman Frank Razny, who told him to register to vote, to get six others to register, and to have his wife register or she could be in trouble. In November Gifford was told to go to Milford, where he picked up an application on November 22.

30. George Hotalen sought PennDOT employment at the Milford Office in the spring of 1974, where he spoke to Mr. Coddington, whom he knew to be the superintendent. Coddington told him that there would be openings later in the year. On November 19, Coddington called Hotalen, told him that he would have a job, and drove him to Gastmeyer's home where Coddington picked up application forms for Hotalen and Sebring. Coddington stated that he obtained the job for Hotalen on the basis of his position as committeeman. Hotalen also lived in Green Township.

31. Bruce Selneck had previously worked for PennDOT at the Milford shed in 1971. He obtained other employment until 1973 when he was laid off. His father approached Mr. Gastmeyer in 1973 to see if he could obtain employment for his son. Selneck later returned to his regular job and heard nothing further about PennDOT employment until his father told him in late November 1974, that Gastmeyer had called and had an application for his son. Selneck filled out the form on November 24 and quit his old job a month later.

32. Ruben Shiffler knew there would be a job open at the Milford shed because his son was so employed and was scheduled to go into military service. He first inquired about possible employment in October 1974. When his son entered the military on November 1, 1974, he actively sought employ-

ment with PennDOT. He first went to a committeewoman, Marjorie Stonnier, got no satisfaction from her, went to Calvin Rhodes, a PennDOT employee, who sent him to a committeeman from Green Township, Frank Razny, who did obtain an application form for him. Shiffler was hired on December 30, 1974.

33. Adam Sneddon began working on December 26, 1974. In June or July of that year, at the suggestion of Democratic Committeeman Campbell, Sneddon called Mr. Gastmeyer, who said that he would keep Sneddon in mind for a job. In early December 1974, Gastmeyer gave Sneddon a job application. Three weeks after he filled out the form, Sneddon was notified that he had a job.

34. Until the time that they were hired, none of the nine applicants was advised of any commitment for a job from PennDOT officials or county political leaders.

35. Johanson, Sebring, Hotalen, Selneck, Sneddon, Gifford, Shiffler, and Orven all obtained their application forms directly from Gastmeyer or indirectly through other political leaders. Hoeper received his application through his father, a PennDOT employee, but was unaware of where his father obtained it.

36. On April 2 or 3, 1975, Mrs. Mazus obtained an application form from Elmo Hall of the Governor's Personnel Office. The form was sent to Mrs. Mazus at the request of PennDOT's Personnel Director, Mr. Harhigh, who was concerned about plaintiff's inability to obtain an application form in Pike County. Mrs. Mazus returned the completed form to Mr. Hall on April 5, 1975. PennDOT received a copy of that application on April 6, 1975.

37. In early 1975, Mr. Harhigh told Coddington that failure to consider a female applicant was contrary to Departmental policy and informed him that Mrs. Mazus should be hired for the next job that became available. Harhigh's directives were reinforced by a May 5 letter to Mrs. Mazus from Jacob Kassab, Secretary of Transportation, in which he acknowledged receipt of the application and stated that he had directed Mr. Coddington to give her consideration for any vacancy for which she qualified.

38. Mr. Coddington received a copy of Secretary Kassab's letter acknowledging receipt of plaintiff's application; however, the PennDOT Bureau of Personnel had decided to control the appointment of Mrs. Mazus to the next Highway Maintenance Worker position from the Central Office in Harrisburg. Although no vacancies existed when plaintiff's application was received, Mr. Harhigh, the Director of Personnel, had directed his staff to give to Mrs. Mazus the next permanent Highway Maintenance Worker position, but he did not specify anything concerning temporary or seasonal jobs. From April of 1975 until the present, all of the permanent Highway Maintenance openings in Pike County have been handled through the Bureau of Personnel in PennDOT's Central Office.

39. Mr. Coddington received authorization in March 1975, to hire two maintenance workers as roadside rest attendants. These jobs were of approximately six months duration. PennDOT had a practice of filling jobs, when possible, with persons who had held them in the previous year. Daniel Morella, who had worked at a roadside rest in Pike County during the summer of 1974, on recommendation of Mr. Gastmeyer, was rehired under that arrangement.

40. The second position authorized for Pike County during 1975, was assigned to John Keuling, who was hired on June 27, 1975. A man in his thirties, he had sought an engineering job with PennDOT through Thomas Robinson, a Democratic committeeman, early in 1975. When he was unable to obtain that type of work, Keuling again spoke to Robinson in the middle or end of May, asking for any available employment. A week or two later, Keuling was called and told that an application awaited him at the Milford office, which he completed. He started a week later, continuing in the job until December. Keuling obtained the same job in June 1976, and again worked through December.

41. The Central Office personnel staff did not offer this job to Mrs. Mazus because Mr. Harhigh was not aware that she was interested in seasonal employment as a roadside rest attendant. Coddington did not know that Mrs. Mazus sought this temporary position until the spring of 1976.

42. After the hirings of November and December of 1974, in Pike County, the first permanent Highway Maintenance Worker position that was available was given to Mrs. Mazus by the order of Mr. Harhigh. She was hired and started working as a Highway Maintenance Worker in May of 1977.

43. On November 7, 1975, EEOC issued its determination that there was reasonable cause to believe that Mrs. Mazus was denied the opportunity during 1974 to apply for a highway maintenance job on the basis of her sex and reasonable cause to believe that PennDOT discriminates against women as a class in hiring. Mrs. Mazus was given a ninety-day notice of her right to sue on March 12, 1976. This litigation was commenced within that ninety-day period by the filing of a complaint and summons on May 28, 1976.

44. PennDOT employs individuals in its county maintenance organizations in three semiskilled classifications: highway maintenance workers, semiskilled laborers, and tradesman helpers. The United States Census Statistics for the category of "laborers-except farm" for Pennsylvania was not shown to represent an accurate statistical source of employees in private industry whose skills are comparable to those used by the semiskilled workers employed by PennDOT.

45. For the period 1970–1976, the census shows that women occupied 7.6% of the positions represented by the category of "laborers-except farm" for the entire state. PennDOT employed only six women in semiskilled positions, or 0.17% of that group of employees.

For the state as a whole, the census reflects women occupying 70.3% of all clerical positions, while in PennDOT women represent 97.9% of the clerical work force in the county maintenance organizations.

46. For the seven counties in PennDOT District 4 (Bradford, Lackawanna, Luzerne, Pike, Susquehanna, Wayne, and Wyoming), during 1970–76 the census shows that women held 7.3% or 883 of the jobs in the classification of "laborers-except farm," while PennDOT employed but one woman in the semiskilled classifications, 0.26% of its laborer work force. At the same time women held 67.4% of the clerical jobs in the private sector, while in PennDOT they oc-

cupied 80.0% of those jobs in the county organizations.

47. In Pike County for the six-year period, women occupied 11, or 5.6% of the laboring jobs in the private sector, while they held none of the semiskilled PennDOT positions. They occupied 68.5% of the clerical jobs in private industry, and 100% of those jobs within PennDOT's county organization.

48. PennDOT conducted an internal EEOC review for Pike County operations covering the year 1974. The review rated Pike County deficient in all categories of utilization of women and minorities.

49. The Commonwealth of Pennsylvania, Bureau of Employment Security, provides unemployment compensation for workers who are out of work through no fault of their own, and also finds suitable employment for unemployed or underemployed workers. In order to render these services, the Bureau keeps records of the applicants who applied for employment through their offices statewide. Anyone can avail him or herself of the services of the Bureau of Employment Security by registering there for work. This is so whether they are collecting unemployment compensation or whether they are just entering the labor market or re-entering the labor market, or if they have been underemployed or working part-time. One record generated by the Bureau of Employment Security is a statewide computer printout which shows the total number of applicants registered by occupational groupings. This record is generated when an applicant registers for employment in one of the offices of the Bureau of Employment Security because his application card is fed into a computer system whereby it is coded through a regular computer program. Therefore, every applicant who comes into the Bureau of Employment Security in Pennsylvania is categorized in at least one of the job classifications that the Bureau has. Under Code No. 899884 the following occupations are listed: Bondactor, machine operator, chimney repairman, diver helper; then the subgroup in that field lists bellman, diver assistant, diver tender, lifeline tender, hose tender; then in highway maintenance: highway maintenance man, highway patrolman, snowplow operator, truck, snowplow tractor operator, house trailer lot utility man, maintenance man house trailer, maintenance man helper,

factory or mill, general maintenance helper, mobile home repairman, serviceman house trailers, pipeliner, sewer pipe cleaner, electric sewer cleaning machine operator, shaft man; in the mining and quarrying industry: maintenance man, shaft mechanic, shaft repairman, shaft tender, towel cabinet repairman, and window repairman. The records of the Bureau of Employment Security indicate that for the period ending on December 31, 1975, 175 people were seeking employment of this type within the Commonwealth of Pennsylvania. Of this number, only one was a woman. For the period ending December 31, 1976, 291 people were seeking this type of employment throughout the Commonwealth of Pennsylvania, while only two were females. For the period ending September 31, 1977, 241 people were seeking this type of employment in the Commonwealth of Pennsylvania, while only one of these was a female. These statistics demonstrate that very few women registered with the Bureau of Employment Security seeking the Highway Maintenance Worker type of position in Pennsylvania. Plaintiff is the only woman ever to have sought such a job in Pike County.

50. Very few women have sought Highway Maintenance Worker positions with PennDOT because of the nature of the work, the hours of the work, and the conditions of employment.

51. Records kept by PennDOT indicate that for the last quarter of 1974, there were 14,370 employees in positions in which the hiring was controlled by the Governor's Personnel Office. The total number of females in these positions was 2,506. Therefore, women represent 17.4 percent of the total employees in positions governed by the Governor's Personnel Office within PennDOT for the last quarter of 1974. In 1975 there were 13,533 employees in these positions, while 2,380 of these were females. Therefore, females comprise 17.5 percent of the total number of employees under the direction of the Governor's Personnel Office. For the third quarter of 1977, there was a total of 12,479 employees in these classifications of which 2,147 were females. Therefore, 17.2 percent of the total number of employees were females.

52. For the first quarter of 1974, PennDOT employed 3,030 Highway Maintenance Workers statewide. Three of these were

females. For the first quarter of 1975, PennDOT employed 3,133 Highway Maintenance Workers, of which four were females. For the first quarter of 1976, PennDOT employed 2,889 Highway Maintenance Workers; of these, five were females.

## DISCUSSION

### Title VII

█ A Title VII case is divided into three phases. First, the plaintiff must demonstrate a prima facie case of discrimination. Then the defendant is called upon to articulate a legitimate nondiscriminatory reason for its action. Finally, the plaintiff is afforded an opportunity to show that the proffered reason is in fact a pretext designed to cover what is actually an illegal discrimination.

█ Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), a plaintiff makes out a prima facie case by showing:

(i) that [she] belongs to a [protected class]; (ii) that [she] applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite her qualifications, she was rejected; (iv) that, after her rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications.

A prima facie case under *McDonnell Douglas* raises an inference of discrimination because acting in such a totally arbitrary manner, without any underlying reasons, is more likely than not based on the consideration of impermissible factors. The burden then shifts to the employer to prove that he based his employment decision on a legitimate consideration, and not on an illegitimate consideration such as sex. The plaintiff must be given the opportunity to introduce evidence that the proffered justification is merely a pretext for discrimination. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577–8, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978). The Act does not command that a person be hired simply because she is a member of a protected class; discriminatory preference is precisely and only what Congress has proscribed. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

With these legal principles illuminating the way, the court will proceed to analyze and discuss the evidence in this case.

The established practice of hiring of non-Civil Service highway maintenance workers in Pennsylvania in 1974 and 1975 was one of patronage. The Governor's personnel office authorized the filling of vacancies and provided the applications for the Democratic County Chairman in each of the counties. Only one application existed for each position and receipt of an application from the County Chairman was tantamount to being designated for the position. Upon being notified by the Governor's Personnel Office of the existence of a vacancy and being furnished with an application, the County Chairman would then make the decision as to who would receive the appointment. The application would then be made available to the successful applicant either directly by the Chairman or indirectly through one of its political subordinates. After execution, the County Superintendent would forward the application to the PennDOT Personnel Office in Harrisburg where it would be approved unless the applicant was not qualified.

█ Mindful of the fact that there had been a job freeze since 1971, it is permissible to infer that Gastmeyer had a ready list in his "memory bank" of potential applicants for highway maintenance positions. This is corroborated by Coddington who stated that there were more applicants than there were jobs to be filled. Gastmeyer's modus operandi was to distribute the jobs in the areas of the county where the new employees would be expected to work and also in those municipalities where it would be most advantageous politically. Coddington testified that Gastmeyer would ask him as County Superintendent where the jobs were most needed and would "try and hire them out of the area that they're going to work in." No doubt, Gastmeyer was receiving requests for positions from political subordinates who, like Coddington in his capacity as Democratic Committeeman, were desirous of obtaining positions for the constituency within their municipalities. Therefore, when Secretary Kassab informed Coddington in July 1974, that the job freeze in existence since 1971 was about to be broken for a limited number of highway maintenance jobs, it can only be assumed that

Gastmeyer promptly determined in his own mind the municipalities in which, and the lieutenants to whom, these positions would be allocated. I find, therefore, that at the time plaintiff first inquired of Gastmeyer about a highway maintenance position, all had been spoken for and her gender played no part in the fact that she was not selected. While there may have been some adverse reaction and comment by Coddington and other personnel in the District Office in Dunmore concerning the inadvisability of placing a woman in a highway maintenance position, these factors were insignificant because the individuals involved played no part in the actual hiring decisions. Similarly, the failure to provide her promptly with an application, especially where the longstanding practice was that receipt of an application was the equivalent of receiving the job, cannot be interpreted as a sexually animated effort to deny her access to employment with Penn-DOT. Any applicant, male or female, who had not been selected for appointment by Gastmeyer or his political associates could not expect to receive an application under the prevailing policy merely by asking for one. Some of the successful applicants who were hired in November and December 1974, had been seeking those jobs for lengthy periods of time. The evidence of record did not reveal any instance where a male applicant readily and immediately procured an application merely by asking for one from Gastmeyer, Coddington or any other highway official. Moreover, Gastmeyer dispensed them only when there was a vacancy and the particular applicant had been selected for the job. The fact that plaintiff did not immediately receive an application was not out of the ordinary and, indeed, was to be expected. Furthermore, she only made one personal effort to contact Gastmeyer, notwithstanding the fact that all PennDOT employees advised her that he was the source of all applications and, in fact, it was the manner in which her husband had obtained employment. In short, during the pertinent time period in 1974, Gastmeyer controlled the applications and appointments in Pike County, not Coddington, Davis, Knight, or Harhigh. Gastmeyer obviously worked through political lieutenants as is evidenced by the route taken by the successful applicants. Under the circumstances here present, I conclude that

Gastmeyer's failure to recommend plaintiff for a highway maintenance position was not the result of bias because of her sex but because there were no openings when she first contacted him. Therefore, a prima facie case has not been made out because plaintiff was not rejected for a job for which the employer was seeking applicants at the time plaintiff applied and the employer did not continue to seek other applications. Even if a prima facie case had been made out as to the 1974 hirings, it was sufficiently rebutted by the evidence that the jobs were assigned to others because their interest in these positions predated plaintiff's inquiry and not because of any sex discrimination.

It should also be pointed out that, aside from her husband's inquiry of Coddington in early November 1974, the first active step taken by plaintiff was on November 19 when she visited the PennDOT district office and was told to contact Gastmeyer for an application. This she did the following day and, when Gastmeyer was not at home at the appointed hour, she informed Coddington of this fact. On November 21st she returned to the district office and told Davis of her problem and was advised again to contact Gastmeyer. Plaintiff then contacted the EEOC field office and Mr. McCoy, the Agency Director, promised to request an application from the district engineer, Mr. Harrington. On November 25th, Mr. Chichilla, the district's administrative officer, after receiving a call from the Penn-DOT office in Harrisburg, called Mr. Zenyuh in the Governor's personnel office and requested an application for plaintiff. When none was received by plaintiff, she filed a charge of discrimination with EEOC on November 29, 1974.

This chronology reveals that starting with plaintiff's first visit to the district office on November 19th, a flurry of activity was triggered which included the involvement and participation of highway district employees, the PennDOT office in Harrisburg, EEOC, and the Governor's personnel office. I believe that the response from Coddington, Davis, Chichilla, Marsh, and Zenyuh was at least as, and probably more, prompt than any male applicant similarly situated could expect to receive. I am satisfied that the filing of the complaint with the EEOC was responsible for the directive in early 1975 emanating from Mr.

Harhigh that plaintiff was to receive the first highway maintenance position that became available in Pike County. My evaluation of the testimony and other evidence of record convinces me that plaintiff, in fact, secured an advantage over male applicants because PennDOT officials were alarmed by the charge of sex discrimination.

Subsequently, in March 1975, the hiring of two roadside rest attendants in Pike County for a six-month period was authorized by PennDOT. Daniel Morella had worked in that capacity during the prior summer and, pursuant to a policy of favoring those who served previously, was rehired. John Keuling was hired for the other position even though he did not apply for work until early 1975. Plaintiff's application was on file when Keuling was hired on June 27, 1975, but she was not contacted.

■ There is no doubt that plaintiff was qualified for the roadside rest position. As to Morella, there may be some question whether plaintiff has established a prima facie case of discrimination inasmuch as he had previously worked in that capacity for PennDOT, his application had obviously predated plaintiff's, PennDOT customarily rehired furloughed employees, and, consequently, there is doubt as to whether the employer was seeking new applicants for this position. However, mindful of the fact that the court should not be overly demanding in the proof required for a prima facie case, I determine that a prima facie case of discrimination has been established and that the burden shifts to the employer to prove that the employment decision was based on a legitimate consideration and not on the illegitimate factor of sex. The rehiring of Morella presents no problem. It was an understandable and sensible decision to rehire for this seasonal position the man who had previously filled that responsibility. I accept this justification and also find that it was not proffered as a pretext for sexual discrimination.

The Keuling hiring appears in a different light because plaintiff's application was on file before Keuling's and, nevertheless, he received the appointment. The legitimate nondiscriminatory reason given by the employer, through the testimony of Harhigh and Coddington, was simply that they did not know that she was interested in a sea-sonal roadside rest opportunity as distinguished from the conventional highway maintenance worker position. It must be remembered that in early 1975 Harhigh had directed Coddington to hire plaintiff for the next job that became available. Both Harhigh and Coddington testified that this was intended to apply to a permanent highway position and that they never thought that plaintiff would be interested in something less. I had the opportunity to observe these witnesses testify and I am completely persuaded that they were telling the truth. Mr. Harhigh is the one who saw to it that plaintiff received an application from the Governor's personnel office in April 1975, and also ordered Coddington to give her preference on the next vacancy. He had been fully supportive of plaintiff and there is not a shred of evidence of any sexual animosity on his part. To me, he was totally credible. Therefore, I accept the testimony of Harhigh and Coddington and conclude that the employment decision was based on a legitimate consideration, i. e., the belief that plaintiff was not interested in seasonal employment, and not because of her sex.

■ Plaintiff also contends that gross statistical disparities in evidence here establish a prima facie case of discrimination against the class. "Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination." *Hazelwood School District v. United States*, 433 U.S. 299, 307, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977). A proper statistical analysis includes comparison between the sexual composition of an employer's employees and the sexual composition of the qualified class members in the relevant labor market. *Id.*, at 308, 97 S.Ct. at 2741. Utilizing 1970 census figures, plaintiff points out, for example, that for the entire state women made up 7.6% of the work force of "laborers-except farm," while in PennDOT for the period 1970–1976, women made up but 0.17% of laborer-type jobs (6 of 3,608). Plaintiff argues further that if women were hired by PennDOT in the proportion suggested by the census, they would have held 273 labor intensive positions rather than 6. However, there is no showing that the laborers-except farm classification would be similar to highway maintenance workers. It could include a significant

amount of unrelated jobs, such as defense counsel's suggestion that it includes inside workers. Mr. John Devine, Assistant District Manager for Employment Services in Pennsylvania, described the "laborers-except farm" classification as "very broad." These statistics are not demonstrably similar to the position at issue here and cannot be confidently relied on as a basis for concluding that a pattern or practice of sex discrimination exists.

On the other hand, the Bureau of Employment Security occupational grouping is far more detailed and comprehensive and appears to be more accurate in ascertaining the percentage of women working, and seeking employment in the relevant labor market. When an individual registers with the Pennsylvania Bureau of Employment Security, a professional interviewer personally assists the applicant in filling out the application with information that would assist in determining the proper job classification. The application is then fed into a computer where it receives a number, or numbers not exceeding four, as identified in the United States Department of Labor Dictionary of Occupational Titles, from the information contained in the application. The number "899884" is such a number and encompasses numerous occupations including, and similar to, that of highway maintenance man. For the period from January 1, 1975, to September 30, 1977, the number of females registered to do such work and assigned number 899884 varied from 0.41% to 0.68%, certainly a minimal number. It is true that the hiring procedures for highway maintenance workers did not involve public advertising but, as Mr. Harhigh emphasized, very few females seek this type of outside laboring work because it is physically demanding and generally unappealing to them. To note this obvious fact does not carry with it the imprint of attributing to women a stereotyped role in our society. To be sure there are some females who would be interested in this type of physical work but a reliable percentage has not yet been developed. The Civil Rights Act assumes that the protected groups are both qualified and interested in this type employment. *League of United Latin American Citizens v. City of Santa Ana*, 410 F.Supp. 873 (C.D. Cal.1976). That a large number of females are not interested in this type work scarcely needs stating. The actual applicant flow data is highly relevant proof of the availability of qualified applicants in the relevant labor market. *Hazelwood School District v. United States*, supra, 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13. Assuming arguendo that the statistics establish a prima facie case of a pattern or practice of sexual discrimination, it has been rebutted by the showing that very few females have expressed an interest in positions as highway maintenance workers and only one, the plaintiff, ever sought such placement in Pike County. Moreover, my analysis of the factual background surrounding the actual hirings in 1974 and 1975 in Pike County convinces me, as fact finder, that there was no sex discrimination involved.

Plaintiff's contention that the Pennsylvania patronage system violated Title VII likewise must fail. Plaintiff complains that "patronage hiring requires specialized knowledge and attributes having no relationship to an individual's ability to perform a highway maintenance job" and requests the court to order an end to patronage hirings. In *Furnco Construction Corp. v. Waters*, supra, the Supreme Court warned about the dangers involved where a court requires an employer to adopt what it perceives to be the best hiring procedures and held that a judicial mandate imposing a method which requires an employer to consider the largest number of protected applicants "finds no support either in the nature of the prima facie case or the purpose of Title VII." *Id.*, 438 U.S. at 577, 98 S.Ct. at 2949. The Court stated that "Title VII prohibits [an employer] from having as a goal a work force selected by any proscribed discriminatory practice, but it does not impose a duty to adopt a hiring procedure that maximizes hiring of [protected]

employees," *id.* at 577, 98 S.Ct. at 2950. There is no evidence of record showing that Pennsylvania's patronage system has as a goal a work force selected by any proscribed discriminatory practice.

## PATRONAGE HIRING AND THE FIRST AND FOURTEENTH AMENDMENTS

Relying on *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), plaintiff asserts that PennDOT's use of patronage hiring violates the First and Fourteenth Amendments to the United States Constitution. She argues that by imposing the patronage hiring system on her, PennDOT and the Commonwealth violated her First Amendment right to complete freedom in deciding whether to participate in, or abstain from, political associations. There is no evidence in this record that plaintiff was denied an application because of her political beliefs or associations, or that highway maintenance positions were given to members of only one political party. Moreover, as Judge Aldisert observed in his dissent in *Rosenthal v. Rizzo,* 555 F.2d 390, 396 (3d Cir. 1977), a majority of the Supreme Court justices in *Elrod* could not ascribe to the plurality's broad renunciation of the patronage system and that "in concurrence, Justice Stewart articulated the rule of the case: '[A] nonpolicy making, nonconfidential government employee [cannot] be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs.'" 427 U.S. at 375, 96 S.Ct. at 2690. *Elrod* does not stand for the proposition that all patronage hiring infringes on First Amendment rights and, furthermore, as previously noted, there is no evidence that plaintiff's failure to obtain an application and appointment as a highway maintenance worker was conditioned in any way which infringed her right of political association.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this action under 42 U.S.C. § 2000e–5(f)(3), 28 U.S.C. § 1343(3), (4), and 28 U.S.C. § 1331(a).

2. Plaintiff has not satisfied the class action requirements of Fed.R.Civ.P. 23 and this action will not be certified as a class action.

3. Plaintiff has not established by competent statistics gross disparities in hiring patterns or practices which would constitute prima facie proof of discrimination against her or the class she purports to represent.

4. Plaintiff has not made out a prima facie case of discrimination against her in the hiring of highway maintenance workers in 1974.

5. Even if the statistical data and/or the evidence surrounding the hirings in 1974 were sufficient to show a prima facie case of sex discrimination, defendants have satisfied their burden of showing that the employment decisions were based on legitimate considerations and not an illegitimate consideration, such as sex.

6. Plaintiff has made out a prima facie case of discrimination in the 1975 hirings of two roadside attendants but defendants have satisfied their burden of showing that these employment decisions were based on legitimate considerations and not on an illegitimate consideration, such as sex.

7. Plaintiff has not established by competent proof that Pennsylvania's patronage system violates Title VII.

8. Plaintiff has not established by competent proof that Pennsylvania's patronage system infringed on her right of political association or in any way violated her rights under the First and Fourteenth Amendments to the United States Constitution.

9. Plaintiff is not entitled to injunctive relief or damages and judgment will be entered for all defendants.